Filed 8/24/20  P. v. Chavez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VINCENT FLAVIO CHAVEZ et al.,<br><br>Defendants and Appellants. | C080117<br><br>(Super. Ct. No. 11F08010)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 10, 2020, be modified as follows:

1.  On page 14, footnote 6, the last sentence of the footnote is replaced with the following sentence:

Those types of allegations—including most of Diez's claims here—may be raised on appeal even if not raised at trial.  (*Ibid.*)

2.  On page 17, before part III of the discussion, the following paragraphs are added to the end of part II of the discussion:

In a petition for rehearing, Diez suggests that even if the instruction in *Debose* were correct, the same cannot be said of the instruction here.  That is because the instruction in *Debose*, unlike that here, said a robbery " 'is still in progress so long as [the] *immediate* pursuers are attempting to capture the perpetrator or to regain the stolen property.' " (*Debose*, *supra*, 59 Cal.4th at p. 204, italics added.)  Although the instruction in *Debose* also had language echoing that here—in particular, it said " '[a] robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property' " (*ibid.*)—its additional language that a robbery is still in progress when a defendant is fleeing "immediate" pursuers, Diez suggests, provided a critical clarification that was missing here.

We reject the argument.  Again, in describing when a robbery is complete, both the trial court's instruction here and the court's instruction in *Debose* used language that, in our view, was not meaningfully different.  And because the *Debose* court found the language there "correctly stated the law" (*Debose*, *supra*, 59 Cal.4th at p. 204), we find the same true here.  That said, we acknowledge the instruction in *Debose* was more expansive.  Relevant here, beyond discussing when " '[a] robbery is complete,' " it also said a robbery " 'is still in progress so long as [the] immediate pursuers are attempting to capture the perpetrator or to regain the stolen property.' " (*Ibid.*)  But in noting the absence of this language in the instruction here, Diez has at most shown the trial court's instruction was incomplete, not improper.  That, however, is not ground for reversal. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson*, *supra*, 38 Cal.4th at pp. 1011-1012.)  And because Diez never requested his preferred

2

" 'clarifying or amplifying language' " about "immediate" pursuers at the trial level or even in his opening appellate brief, we find the issue forfeited. (*Ibid.*)

This modification does not change the judgment.


BY THE COURT:


_____/s/_____
BLEASE, Acting P.J.


_____/s/_____
MURRAY, J.


_____/s/_____
BUTZ, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/10/20  P. v. Chavez CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C080117 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F08010) |
| v. | |
| VINCENT FLAVIO CHAVEZ et al., | |
| Defendants and Appellants. | |

Two armed men robbed a couple in a Best Buy parking lot and, after a third man pulled up in an SUV, the two robbers jumped in the SUV and fled.  Minutes later, and following a brief chase, officers stopped and arrested defendants Vincent Flavio Chavez, Martin Rudolfo Diez, and a third codefendant, who were still carrying loot from the robbery.  A jury afterward convicted Chavez and Diez of second degree robbery and resisting or obstructing a peace officer.  It also found Chavez used a firearm in the commission of the robbery.

1

Both Diez and Chavez now appeal.  Diez raises four arguments in his appeal, contending (1) the admission of his postarrest statement to the third codefendant—in which Diez stated, "don't say anything, ask for a lawyer"—violated his First Amendment rights and Evidence Code section 352; (2) the trial court wrongly instructed the jury about aiding and abetting a robbery; (3) the prosecutor committed prosecutorial misconduct in referring to the "conscience of the community," in stating his personal thoughts about the facts, and in asking an officer if he had "any question in [his] mind that [he] had arrested an innocent man" when he apprehended Chavez; and (4) the trial court wrongly admitted a photograph showing Diez pointing upward—a gesture he contends the jury could have interpreted as a gang sign.

Chavez joins all but Diez's instructional error claim and offers four additional arguments.  In particular, he asserts (1) the court's errors, even if not individually prejudicial, were cumulatively prejudicial; (2) insufficient evidence supported the jury's finding that he personally used a firearm during the commission of the robbery; (3) he is entitled to two additional days of presentence custody credit; and (4) we should remand to allow the trial court to exercise its newly granted discretion under Penal Code section 12022.53 to strike his firearm enhancements.

We agree remand is appropriate to allow the trial court to consider whether to strike or dismiss Chavez's firearm enhancements.  We also agree Diez and Chavez are both entitled to two additional days of presentence custody credit.  In all other respects, we affirm.

BACKGROUND

I

*Factual Background*

Around 7:00 p.m. on November 27, 2011, Susan B. and Greg S. were approached by two men in a Best Buy parking lot.  Both men had covered their faces with their shirts. One "brandished" a gun at Susan B. and demanded her purse.  The other showed Greg S.

2

a gun in his coat. After Susan B. handed over her purse, she heard someone yell, "hurry" and "get in the car." The two robbers then jumped in an SUV that had pulled up beside them and fled. Susan B. memorized the license plate "as best [as she] could" and called 911.

Minutes after the robbery was reported, several police officers spotted a Ford Explorer matching the description Susan B. provided. As the officers gave pursuit, the Explorer turned off its headlights and pulled onto a street that ended in a cul-de-sac. After the Explorer stopped at the end of the cul-de-sac, one of the officers saw three people flee the SUV on foot. The pursuing officers promptly caught and arrested two of the three fleeing suspects—Diez and Michael Barajas.[1] As they did, Diez told Barajas, "Hey, cousin, don't say anything, ask for a lawyer." Shortly after, the officers found the third suspect, Chavez, hiding in a nearby dumpster.

The officers afterward searched in and around the Explorer. One officer found Susan B.'s purse and some of her other possessions in the Explorer, and another found in the middle of the street, near the Explorer, a backpack containing a loaded Smith & Wesson .357-caliber revolver, jewelry, and a notebook listing various names, including Chavez's name and his mother's name. One of the officers also found a cell phone that Diez later claimed was his. On searching the phone, the officer found a photograph taken the night before of a .357-caliber revolver that matched the gun found in the backpack, and a text message in which Diez offered to sell a "357 magnum." The officers also later found Susan B.'s cell phone in Barajas's jacket pocket.

About 30 to 40 minutes after the robbery, officers brought Susan B. and Greg S. to the scene to determine if they recognized Diez, Chavez, or Barajas. Although neither Susan B. nor Greg S. could positively identify any of the three suspects, Susan B. said the

---

**1**     The third codefendant Michael Barajas, who is not a party to this appeal, resolved his case by plea prior to trial.

3

height and body type of two of the men were consistent with the two men who robbed her and Greg S. She said Chavez looked "familiar," though she was "not certain," and said she was "not sure" about Barajas. But she said Diez was "not familiar."

Both Susan B. and Greg S. identified the Explorer—which had a magnetic sign on the driver's door with Diez's cell phone number and the name "Shine on Productions"—as the SUV involved in the robbery.[2] Both also said the Smith & Wesson .357-caliber revolver found in the backpack appeared to be one of the guns used in the robbery. Before being brought on scene, Greg S. had previously described the gun held by one of the robbers as a .22-caliber handgun—though the officers did not find a gun with a similar caliber that evening. The following day, however, after a woman reported seeing a gun in the gutter, an officer found a loaded Lorcin .25-caliber handgun in the gutter of the street where Diez, Chavez, and Barajas were apprehended.

II

*Procedural Background*

Diez and Chavez were charged with second degree robbery (Pen. Code, § 211), concealing stolen property (Pen. Code, § 496, subd. (a)), and resisting or obstructing peace officers who were discharging their official duties (Pen. Code, § 148, subd. (a)(1)). Both were also charged with a firearm enhancement relating to the robbery count (Pen. Code, § 12022, subd. (a)(1)) because, the prosecution alleged, both were principals in the offense and at least one principal personally used a firearm during the commission of the robbery. Chavez was further charged with a second firearm enhancement (Pen. Code, § 12022.53, subd. (b)) because, the prosecution alleged, he personally used a firearm during the commission of the robbery.

---

[2] At the time of the robbery, the Explorer was registered to a person named Javier Perez. Investigators attempted and were unable to locate Perez.

4

The jury found both Diez and Chavez guilty of second degree robbery and resisting or obstructing a peace officer. It also found true the two firearm enhancements alleged against Chavez, but found not true the one firearm enhancement alleged against Diez.

The trial court sentenced Diez to state prison for five years on the robbery count and imposed no additional time on the obstruction count. It sentenced Chavez to state prison for three years on the robbery count and an additional 10 years for the enhancement based on his personal use of a firearm. The court stayed the sentence on Chavez's other firearm enhancement, per Penal Code section 654, and imposed no additional time on the obstruction count.

Diez and Chavez timely appealed.

DISCUSSION

I

*Admission of Diez's Statement to Barajas*

Diez and Chavez first argue the court below erred in admitting Diez's statement telling Barajas to remain silent and to ask for an attorney. At trial, Diez objected to the admission of this statement under the Fifth Amendment. But on appeal, Diez and Chavez have taken a slightly different approach. They now argue the statement should have been excluded under the First Amendment and Evidence Code section 352.[3] We find neither claim was preserved and, in any event, we find both claims fail on the merits.

A. *First Amendment Claim*

We start with the First Amendment claim.

Neither Diez nor Chavez preserved this claim on appeal. Although true Diez challenged the admission of his statement under the Fifth Amendment, he never objected

---

[3]     Undesignated statutory references are to the Evidence Code.

5

on First Amendment grounds. Chavez, in turn, never objected to the admission of this statement at all.

Diez and Chavez nonetheless maintain their objection was preserved for two reasons. First, they claim Diez's objection under the Fifth Amendment sufficiently apprised the trial court of their unsaid objection under the First Amendment. But although true an "objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented" (*People v. Scott* (1978) 21 Cal.3d 284, 290), the record here does not support this finding. At trial, Diez grounded his objection on the Fifth Amendment, and the court had no basis to suppose Diez's objection, "despite inadequate phrasing," was somehow instead based on the First Amendment.

Second, Diez and Chavez contend their First Amendment claim is preserved because it raises a pure question of law. We disagree. Although we are "generally not prohibited from reaching a question that has not been preserved for review by a party," the same is not true "when the issue involves the admission (Evid. Code, § 353) or exclusion (*id.*, § 354) of evidence." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) The only exception for considering evidentiary issues not raised at trial is if the party's objection at the trial level would have been futile. (See *People v. Cage* (2015) 62 Cal.4th 256, 282.) But neither Chavez nor Diez has claimed an objection on First Amendment grounds would have been futile.[4]

In any event, Diez and Chavez's argument fails on the merits. The free speech clause of the First Amendment, made applicable to the states by the Fourteenth

---

[4] Chavez did contend his objecting on Fifth Amendment grounds would have been futile because the trial court already rejected Diez's Fifth Amendment objection. Although that logic might serve to preserve an objection on Fifth Amendment grounds, it does not preserve an entirely different objection on First Amendment grounds.

Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." (U.S. Const., 1st Amend.; see *Duncan v. Louisiana* (1968) 391 U.S. 145, 148 [20 L.Ed.2d 491, 495].) But it does not govern the situation here. Diez made a statement and the prosecution then related that statement to the jury. According to Diez, the prosecution's mere sharing of that statement violated his First Amendment rights. But courts have long distinguished between a person's right to express a belief and a person's right to exclude others from hearing that belief. Although a person's beliefs are protected by the First Amendment, " 'the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 629.) Rather, " such evidence is admissible if relevant to some issue that is being tried." (*Ibid.*) And we find Diez's effort to keep Barajas quiet—"don't say anything"—was certainly "relevant to some issue" in tending to show Diez's consciousness of guilt.

Diez's offered cases do not hold otherwise. Those cases he cites involve persons who were prosecuted or risked prosecution *because* of their speech. In *In re Chase C.* (2015) 243 Cal.App.4th 107, for example, the court found a minor who verbally urged other minors not to cooperate with police was wrongly convicted of unlawfully interfering with police activity. (*Id.* at pp. 109-110.) In *NAACP v. Button* (1963) 371 U.S. 415, 428 [9 L.Ed.2d 405, 415], similarly, the United States Supreme Court found unconstitutional a state law making it a crime for a person to "advise[] another that his legal rights have been infringed and refer[] him to a particular attorney or group of attorneys . . . for assistance." (*Id.* at pp. 434, 437.) And in *Houston v. Hill* (1987) 482 U.S. 451 [96 L.Ed.2d 398], the court found unconstitutional a city ordinance making it unlawful to interrupt a police officer in the performance of his or her duties. (*Id.* at pp. 454, 467.) But none of the concerns raised in these cases is present here. Neither Diez nor Chavez was prosecuted because of their speech. Diez's statement was offered as evidence against him, true; but that is not the same as being punished because of speech.

A prosecutor who offers in evidence a defendant's confession to a crime, for example, has not punished that defendant for his or her speech. Rather, to the extent the defendant is punished, it is because of the defendant's underlying criminal conduct. The confession is only evidence that supports the finding of criminal liability. The same is true here. We thus decline to find Diez's First Amendment rights were violated merely because the prosecution repeated what he said.

B.    *Evidence Code Section 352 Claim*

We turn next to Diez and Chavez's claim under section 352.

Evidence may be excluded under section 352 if its probative value is substantially outweighed by the probability that its admission would "(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In Diez and Chavez's view, Diez's statement carried no probative value but was highly prejudicial in calling attention to the fact that Diez sought to remain silent.

But neither Diez nor Chavez show they ever invoked section 352. To "trigger[]" section 352, a defendant must "either expressly invoke[] Evidence Code section 352 as a ground for objection, or at least affirmatively argue[] that the risk of prejudice outweighs the relevance of the proffered evidence." (*People v. Anderson* (1990) 52 Cal.3d 453, 477 (*Anderson*); see *People v. Valdez* (2004) 32 Cal.4th 73, 108 [noting " ' "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal*" ' "].) But in the portion of the transcript Diez and Chavez reference, only Diez offered an objection to the admission of this statement, and he neither "expressly invoke[d] Evidence Code section 352" nor "affirmatively argue[d] that the risk of prejudice outweighs the relevance of the proffered evidence." (*Anderson*, at p. 477.)

8

Diez instead objected on Fifth Amendment grounds alone, suggesting that the prosecution, in offering his statement, was wrongly commenting on his exercising his right to remain silent. Although true Diez also contended admission of his statement would prejudice him, that alone was insufficient to preserve on appeal his objection under section 352. Evidentiary objections must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded." (*People v. Partida* (2005) 37 Cal.4th 428, 435; *Anderson*, *supra*, 52 Cal.3d at p. 477.) But a party does not "fairly inform" the court or the opposing party that it believes certain evidence should be excluded under section 352 merely by making sporadic claims of "prejudice" in the course of making a Fifth Amendment objection. The trial court here, indeed, never understood Diez's objection to be based on section 352. As the court understood it, "the key issue" Diez raised concerned whether the prosecution, in offering his statement, was "comment[ing] on the exercise of the Fifth Amendment Right." And the court ultimately rejected the claim because it found Diez was "not invoking for himself," but rather was "giving advice to another co-defendant with regard to what that co-defendant should or should not do." Diez at that time could have informed the court he was also objecting under section 352, and asked the court to analyze his objection on that ground. But he did not and he "cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, at p. 435.)

Even assuming their objection on this ground was not forfeited, we would not find the trial court abused its discretion in denying the objection.

We review a challenge to a trial court's decision to admit or exclude evidence under section 352 for abuse of discretion. (See *People v. Anderson* (2018) 5 Cal.5th 372, 402.) "As with all actions by a trial court within the exercise of its discretion, as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first

9

impression, we might feel inclined to take a different view from that of the court below as to the propriety of the action.' [Citation.]" (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507 (*Gonzales*).)

With this standard in mind, we consider whether, as Diez and Chavez contend, the probative value of Diez's statement was substantially outweighed by the risk of undue prejudice.

We turn first to the probative value of Diez's instructing Barajas to remain silent. Diez contends his statement—like postarrest silence—was " 'insolubly ambiguous,' " citing *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91], and thus carries no probative value. We find differently. We agree, as *Doyle* provides, a defendant's decision to invoke his or her right to remain silent is "insolubly ambiguous." (*Id.* at p. 617.) But a defendant's effort to keep another person silent is different. As courts have long explained, a defendant's willful attempt to dissuade a witness from testifying is admissible to prove consciousness of guilt. (*People v. Pinholster* (1992) 1 Cal.4th 865, 945 [the defendant's "threatening phone call" to dissuade a witness from testimony "is clearly admissible to show consciousness of guilt"], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007 ["willful attempt to suppress evidence[] is admissible to prove consciousness of guilt"].) And that remains true when a defendant attempts to dissuade a codefendant from testifying, though we acknowledge a defendant's motive may be more complicated in that scenario. In some cases, a defendant may instruct a codefendant to remain silent with the codefendant's own best interest in mind. But on other occasions, perhaps most, a defendant instructs a codefendant to remain silent for the very same reason a defendant instructs nonparty witnesses to remain silent—to prevent that person from testifying against the defendant. In that case, the defendant's instruction carries significant probative value in evincing the defendant's state of mind of consciousness of guilt. (See *People v. Alexander* (2010) 49 Cal.4th 846, 907 [the defendant's statements tending "to

10

support an inference that he did not want" an alleged accomplice to talk to police were relevant to show consciousness of guilt].)

Returning to the facts here, we do not find the trial court abused its discretion in finding Diez's statement relevant for this reason. The court had discretion to conclude that Diez's instruction to Barajas not to say anything—coming moments after Diez was arrested following a failed attempt to flee—reflected Diez's concern that Barajas might provide the police with information that would incriminate Diez.

We consider next whether the probative value of Diez's statement was "substantially outweighed" by the risk of undue prejudice. Diez and Chavez contend the statement's admission was unduly prejudicial for two reasons. First, they argue the introduction of Diez's statement "was cumulative on the issue of consciousness of guilt, since there was other evidence on the issue: flight." But the trial court was not required to handicap the prosecution and require it to elect between introducing Diez's statement or the evidence of flight. As one court explained, "[w]hile a trial judge might easily conclude that a third or fourth witness to the same event or opinion would be cumulative, it is the rare occasion when one of two different types of circumstantial evidence is correctly ruled cumulative. Indeed, it is usually the *accumulation* of circumstantial evidence which makes it convincing." (*People v. Thornton* (2000) 85 Cal.App.4th 44, 48.)

Second, citing *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106] and similar cases, Diez and Chavez contend the use of Diez's statement "inevitably called attention to the fact that [he] himself sought to remain silent and to utilize an attorney to represent him." "In *Griffin,* 'the United States Supreme Court declared that the Fifth Amendment prohibits the prosecutor from commenting, either directly or indirectly, on the defendant's failure to testify in his defense.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 419.) But we do not find *Griffin*'s prohibition violated here. In noting that Diez instructed Barajas not to say anything, the prosecutor was not in any way

11

referencing Diez's own failure to testify. He was instead commenting on Diez's effort to prevent someone else, Barajas, from testifying. The prosecutor contended that Diez was effectively instructing Barajas not to "say anything that is going to bring us all down" and not to "say how we just did this robbery." The prosecutor then argued that this effort to silence Barajas showed that "Diez [wa]s involved in the robbery." But not once in this argument did the prosecutor use Diez's statement to Barajas in a manner to draw attention to Diez's failure to testify. Considering this context, we believe a jury would not reasonably have understood the prosecutor's introduction of Diez's statement as commentary on Diez's own failure to testify. (Cf. *Turner*, at p. 421 [prosecutor's comments that the defendant " '*doesn't have to talk to me*' " and " '*I can't talk to him*' " did not violate *Griffin*; "when viewed in context, the italicized statement referred to the prosecutor's inability to conduct a psychiatric examination of defendant—and not to defendant's failure to testify"].)

Although our research shows no other California court that considered this issue, decisions from other jurisdictions are consistent with our own. For example, in *United States v. Warren* (5th Cir. 1978) 578 F.2d 1058, reversed on other grounds (5th Cir. 1980) 612 F.2d 887, abrogated on other grounds in *United States v. Bengivenga* (5th Cir. 1988) 845 F.2d 593, the Fifth Circuit found the district court did not err in admitting the defendant's statement to his coconspirators " 'not to say anything.' " (*Warren*, at p. 1073.) Unlike commentary about a defendant's invocation of his or her own right to remain silent, the court explained, the admission of this statement " 'did not develop the prejudicial picture of an accused remaining silent in the face of police interrogation at the time of the arrest.' " (*Id.* at p. 1074.) Similarly, in *State v. Nao* (Hawaii Ct.App., Sep. 30, 2011, No. 29990) 2011 Hawaii App. LEXIS 1078, the Hawai'i Intermediate Court of Appeals found the lower court did not err in admitting the defendant's statement to his codefendant "to shut up, to not say anything to the police, and to ask for an attorney."

(*Id.* at p. *2.)[5]  A jury would not, the court found, interpret the defendant's statement as a comment on the defendant's exercise of his constitutional rights.  (*Id.* at pp. *7-8.)  And finally, in *Commonwealth v. Tervalon* (1975) 463 Pa. 581, 594, the Pennsylvania Supreme Court found no error when a prosecutor asked a defendant's father whether he advised the defendant " 'not to say anything further to the police.' "  (*Id.* at p. 594.)  The court reasoned this question "did not either expressly or by reasonable implication indicate that an adverse inference could be drawn from the failure of [the defendant] to testify nor did it draw attention to his failure to do so."  (*Id.* at p. 595.)  We reach a similar conclusion with respect to Diez's statement:  The admission of his statement— which evinced Diez's efforts to silence Barajas—did not, as Diez and Chavez claim, wrongly call attention to the fact that Diez himself sought to remain silent.

II

*The Trial Court's Instruction Under CALCRIM No. 1603*

Diez next contends the trial court erred in using CALCRIM No. 1603 as the jury instruction for aiding and abetting a robbery—the theory under which he was found liable.  CALCRIM No. 1603 reads the same today as at the time of trial:  "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety.  [¶]  A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property."  According to Diez, this instruction misstates the law.  In particular, he contends the "no longer being pursued"

---

[5]     Rule 8.1115 of the California Rules of Court generally prohibits the citation of unpublished California opinions.  But unpublished opinions from federal courts and other states are not governed by rule 8.1115 and may be cited.  (*Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4.)

13

language wrongly suggests that robberies can be " 'retroactively revived' by the police later coming in pursuit," causing "just about every robbery . . . [to] continue ad infinitum." We disagree.[6]

We begin with the common ground. "For purposes of determining aider and abettor liability, the commission of a robbery continues until all acts constituting the offense have ceased"—that is, until "the carrying away of the loot to a place of temporary safety." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164-1165 (*Cooper*), italics omitted.) In evaluating whether robbers have reached a "place of temporary safety," the California Supreme Court has long found relevant whether the robbers are being pursued following the theft. As the court explained in *People v. Boss* (1930) 210 Cal. 245, the crime of robbery is not complete at the moment of the taking, but continues while the robbers attempt to evade immediate pursuers. (*Id.* at p. 250 [robbery not complete if an officer is in "immediate pursuit" of the robbers following the theft]; *id.* at p. 251 ["The defense of felonious possession which is challenged immediately upon the forcible taking is a part of the plan of robbery, or as the books express it, it is *res gestae* of the crime"].) At such moments of flight, the court found, the robbers "have not won their way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession." (*Id.* at pp. 250-251.)

Diez agrees with these background principles. But he contends CALCRIM No. 1603 wrongly departs from them in including the "no longer being pursued" language—language he claims is broad enough to prevent any robbery from ending, for if the police

---

**6** The Attorney General contends Diez forfeited this objection by failing to raise it at trial. But although objections to instructions that are "correct in law" but inappropriate on the facts of the case may be forfeited, the same is not true for claims that the trial court's instructions included "an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) Those types of allegations—including Diez's claim here—may be raised on appeal even if not raised at trial. (*Ibid.*)

eventually come in pursuit, Diez asserts, the robbery will be "retroactively revived." We read the instruction differently. CALCRIM No. 1603, in referring to a "place of temporary safety," expressly contemplates that the place of safety need only be temporary. So if, for a temporary period, a robber "has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property," that is enough for the robber to be found to have reached a place of temporary safety—at which point, the robbery is complete and any later pursuits are irrelevant. (See *Cooper*, *supra*, 53 Cal.3d at pp. 1164-1165.) Diez's concern that a robbery will somehow be " 'retroactively revived' by the police later coming in pursuit" is thus unfounded.

Diez also suggests the "no longer being pursued" language is improper because the California Supreme Court has not expressly endorsed it. But that alone is not ground for finding a jury instruction invalid. Not all jury instructions have been considered by the high court (see, e.g., *People v. Riggs* (2008) 44 Cal.4th 248, 307 [declining to address the propriety of several jury instructions]), yet they are not for that reason alone improper. In any event, the court has found jury instructions similar to CALCRIM No. 1603 to be "correct." In *People v. Debose* (2014) 59 Cal.4th 177 (*Debose*), the court considered a trial court's instructions concerning the duration of a robbery. In doing so, it expressly found "correct" a jury instruction providing that " '[a] robbery is complete when the perpetrator *has eluded any pursuers*, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property.' " (*Id.* at pp. 204-205, italics added.)[7] That instruction derived from

---

**7** In full, the instructions in *Debose* stated: " 'For the purposes of determining whether an unlawful killing has occurred during the commission or attempted commission of a robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time. [¶] A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise it is still in progress so long as [the] immediate pursuers are attempting to capture the perpetrator or to regain

15

CALJIC instructions that preceded CALCRIM and had been provided "since at least 1979." (*People v. Wilkins* (2013) 56 Cal.4th 333, 343, fn. 2.)

We find the *Debose* court's characterization of the CALJIC instruction as a "correct statement of the law" sufficient to reject Diez's claim here. (See *Debose*, *supra*, 59 Cal.4th at p. 205.) The CALJIC instructions in *Debose* vary somewhat from the CALCRIM instructions used here. Under the CALCRIM instructions, the robbery is complete if, among other things, the perpetrator is "no longer being pursued"; and under the CALJIC instructions, the robbery is complete if, among other things, the perpetrator has "eluded any pursuers." But we find no meaningful difference between the two instructions in this regard, and Diez does not contend otherwise. And because the CALJIC instruction was found "correct" in *Debose*, we thus find the similar CALCRIM instruction on pursuit here was also correct.

Diez acknowledges *Debose* found the CALJIC instructions offered a correct statement of the law but asserts this statement from *Debose* is not controlling. Relying on the rule that cases are only authority for issues they specifically consider (see *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 372), Diez contends *Debose* is not controlling on this issue because it "did not involve a situation where the perpetrator was being pursued by the police (or others)." But Diez is only half right. Although true *Debose* did not involve any pursuit, the court nonetheless specifically found the trial court's pursuit instruction was correct—a conclusion that was critical to the court's ultimate holding. The defendant there objected "the trial court erred in giving the portion of the instruction

---

the stolen property. [¶] A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property. [¶] A perpetrator has not reached a place of temporary safety if the continued control over the victim places the perpetrator's safety in jeopardy. A perpetrator's safety is in jeopardy if at any unguarded moment, the victim might have managed to escape or signal for help.' " (*Debose*, *supra*, 59 Cal.4th at p. 204, italics omitted.)

16

regarding pursuers, because there was no evidence that defendant was pursued." (*Debose*, *supra*, 59 Cal.4th at p. 205.) And the court agreed. (*Ibid.*) The court then proceeded to review whether the error was harmless—a review that, notably, varies depending on whether the instruction (1) misstated the law or (2) correctly stated the law but was inapplicable to the facts of the case. Had the court found the instruction misstated the law, as Diez contends, the instructional error would have required reversal unless the error was harmless beyond a reasonable doubt. (See *Cooper, supra*, 53 Cal.3d at p. 1171 ["instructional error, affecting an element of the offense charged, warrants reversal unless it is harmless beyond reasonable doubt"].) But the court instead found the pursuit instructions correctly stated the law but were inapplicable to the facts of the case—a conclusion that resulted in a more lenient harmless error analysis. (*Debose*, at pp. 205-206.) Because that finding was directly relevant to the court's analysis, we reject Diez's suggestion that the court's characterization of these instructions as "correct" was mere dictum.

### III

### *Allegations of Prosecutorial Misconduct*

Diez and Chavez next claim the prosecution committed prosecutorial misconduct on three separate occasions. First, they argue the prosecutor wrongly "urged the jury to act as 'the collective conscience of the community.' " Second, they contend the prosecutor wrongly expressed his own thoughts about the case's facts during closing. And third, they allege the prosecutor committed misconduct in asking an officer "if he had any doubt in his mind that he had arrested an innocent man." We find none of this conduct, however, amounts to reversible error.

A.     *The Prosecutor's "Conscience of the Community" Comment*

We begin with the prosecutor's comment that the jurors are the "conscience of the community."

17

Because neither Diez nor Chavez objected to the comment at trial, we find their objection forfeited on appeal. Although Diez acknowledged he never objected, he contends "a prompt objection and jury admonition could not have unrung the bell," making any objection fruitless. But the California Supreme Court has already rejected similar claims. In *People v. Lang* (1989) 49 Cal.3d 991, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, the defendant objected to similar comments from a prosecutor. (*Lang,* at p. 1041.) But because "no objection was made [at trial] and an admonition would have cured any harm," the court found "the issue is not reviewable." (*Ibid.*) We find the same here.

At any rate, we do not find the prosecutor's comment inappropriate. Relying on several federal cases, Diez contends the prosecutor characterized the jury as the "conscience of the community" for the improper purpose of inflaming the jury's passions. (See *United States v. Koon* (9th Cir. 1994) 34 F.3d 1416, 1444 ["An appeal to the jury to be the conscience of the community is not impermissible unless it is 'specifically designed to inflame the jury' "], revd. in part on other grounds *sub nom. Koon v. United States* (1996) 518 U.S. 81 [135 L.Ed.2d 392].) Diez also, relying on cases taking issue with references to religious authority, contends the "conscience of the community" statement was "akin to injecting religious ideas into closing argument" and thus " 'diminished the jury's sense of responsibility for its verdict.' " Neither argument is persuasive.

First, the prosecutor's "conscience of the community" comment here was clearly not offered to inflame the jury's passions. The prosecutor delivered this comment while discussing the jury's general function—or, as the prosecutor put it, while discussing "juror 101." At the start of his closing, the prosecutor told the jurors they should not base their decision on "public opinion." Nor, he stated, should they "just go along and agree with the people who agree with me." Instead, he explained, the jurors should provide their "individual opinions" based on their review of the evidence. Immediately

18

afterward, he noted, "[a] jury serves as a collective conscience of the community. That simply means you decide." In this context, we cannot say the prosecutor's comment was ' 'specifically designed to inflame the jury.' [Citations.]" (*United States v. Koon*, *supra*, 34 F.3d at p. 1444.)

Second, the "conscience of the community" comment cannot be equated with appeals to religious authority or other comments that dilute the jury's sense of responsibility. The California Supreme Court has made this clear in its capital cases. Although the court has found certain references to the Bible and other religious authority improper in capital cases, it has repeatedly found references to the conscience of the community permissible in these cases. The court's decision in *People v. Sandoval* (1992) 4 Cal.4th 155, 191, affd. *sub nom. Victor v. Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583], is an example of an improper religious reference—a case concerning a prosecutor's paraphrasing of a Bible passage "commonly understood as providing justification for the imposition of the death penalty." (*Sandoval,* at p. 193.) The court found the prosecutor wrongly "invoke[d] higher or other law as a consideration in the jury's sentencing determination." (*Ibid.*) But although religious references of this sort may diminish the jury's sense of responsibility, as Diez notes, the same is not true of general references to the conscience of the community. The court explained as much in *People v. Lucero* (2000) 23 Cal.4th 692. The defendant there, like Diez, contended the prosecutor's reference to the "conscience of the community" in closing "had the effect of diminishing the jurors' sense of personal responsibility." (*Id.* at p. 734.) But the court disagreed, finding the prosecutor "never suggested that the jury should abrogate its responsibility to personally determine whether death was the appropriate penalty." (*Ibid.*) It then explained "[i]t was proper for the prosecutor to describe the jurors as the 'conscience of the community.' " (*Ibid.*)

19

B.    *The Prosecutor's "I know" Comments During Closing Argument*

We next consider the prosecutor's expression of his personal thoughts about the facts during closing argument.  In closing, the prosecutor stated, "I'm telling you, even though I don't believe Mr. Diez actually got out and used the gun, I know that he had that gun.  I know the gun he had was provided for the robbery and I know he knew—."  Following an objection, the prosecutor rephrased his argument.  According to Diez and Chavez, the prosecutor wrongly expressed his personal opinion about the strength of the case and testified about facts that were never introduced in evidence.  We disagree.

Prosecutors cannot "vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it."  (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207 (*Huggins*).)  Nor may they " ' "attempt to bolster a witness by reference to facts outside the record." ' [Citation.]"  (*Id.* at p. 206.)

But prosecutors can "ask the jury to believe the prosecution's version of events as drawn from the evidence."  (*Huggins*, *supra*, 38 Cal.4th at p. 207.)  And that is true even when prosecutors express their personal belief about what the evidence in the case shows.  In *Huggins*, for example, the "prosecutor argued, regarding the defense's version of events, 'None of this can be true.  Please believe me.  He has lied through his teeth in trying to sell this story to you.' "  (*Id.* at p. 206.)  But although the prosecutor suggested he knew the defense's version of events could not be true, the court found no misconduct in his asking the jury to believe his "version of events as drawn from the evidence."  (*Id.* at p. 207.)  Similarly, in *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*), abrogated on other grounds in *People v. Merritt* (2017) 2 Cal.5th 819, the court found no misconduct in the prosecutor saying, " 'I believe,' " " 'I think,' " and " 'I am willing to bet' " during argument.  (*Cummings,* at p. 1303, fn. 48.)  Although the defendant contended these comments reflected "the prosecutor's personal opinion about Cummings's guilt and vouched for witness testimony," the court disagreed, finding the

20

comments reflected instead "legitimate inferences that could be drawn from" the evidence. (*Ibid.*) And likewise in *People v. Roberts* (1992) 2 Cal.4th 271 (*Roberts*), the court found no misconduct in a prosecutor's occasional use of "such phrases as 'I know.' " (*Id.* at p. 310.) Because "the record reveals that every fact to which the prosecutor alluded was supported by some evidence introduced at trial," the court found the prosecutor "did not, in our view, hint that he had access to facts damaging to defendant that were not before the jury." (*Ibid.*; see also *People v. Frye* (1998) 18 Cal.4th 894, 971 ["so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)

The prosecutor's comments here likewise did not rise to the level of misconduct. The prosecutor never hinted "he had access to facts damaging to defendant that were not before the jury." (*Roberts*, *supra*, 2 Cal.4th at p. 310.) Nor did he compare the "case negatively to others the prosecutor kn[ew] about or has tried." (*Huggins*, *supra*, 38 Cal.4th at p. 207.) He instead "ask[ed] the jury to believe the prosecution's version of events as drawn from the evidence." (*Ibid.*) And although he said, "I know" in reference to the facts of the case, "the record reveals that every fact to which the prosecutor alluded was supported by some evidence introduced at trial." (*Roberts*, at p. 310.) The prosecutor said, " 'I know' " Diez had one of the guns that was provided for the robbery, and according to the evidence, investigators found on Diez's phone a photograph of a 357-caliber revolver that matched one of the guns used in the robbery and a text message in which Diez offered to sell a "357 magnum." Consistent with *Roberts*, *Huggins*, and *Cummings*, we find this record insufficient to make out a claim of prosecutorial misconduct.

C.      *The Prosecutor's Questioning an Officer During Closing Argument*

Finally, we consider the prosecutor's asking an officer if he had "any question in [his] mind that [he] had arrested an innocent man" when he apprehended Chavez—the defendant who officers found hiding in a dumpster.  Diez's trial counsel promptly objected to the question, and the court sustained the objection before the officer offered any response.  Diez and Chavez now contend the mere asking of this question constitutes reversible error.  They reason the prosecutor wrongly sought to have the testifying officer vouch for the strength of the prosecution's case.  Perhaps, but the officer never vouched for anything.  Diez objected and the officer never answered the question.  Although Diez and Chavez nonetheless contend they suffered prejudice, in support of the claim, they do nothing more than reference the general standard for finding prejudice.  We find, however, no conceivable prejudice ensued from the question alone.  (*People v. Dykes* (2009) 46 Cal.4th 731, 763 ["[n]o conceivable prejudice ensued" when a prosecutor asked a defendant whether he "had discussed his testimony with his attorney prior to testifying," an objection was sustained, and the defendant never answered].)  That is particularly true in light of the court's instructions to the jury.  The court specifically instructed the jury that "[n]othing that the attorneys say is evidence" and that it "must ignore" questions for which the court sustained an objection.  (CALCRIM Nos. 104, 222.)  "We presume the jury followed the trial court's instructions."  (*People v. Adams* (2014) 60 Cal.4th 541, 578.)

IV

*Admission of the Photograph of Diez, Chavez, and Barajas*

Diez and Chavez next claim the trial court erred in admitting—over Diez's section 352 objection—a photograph in which Diez is pointing up.  The photograph shows Diez together with Chavez, Barajas, and a fourth person.  The prosecution offered it in evidence to show Diez, Chavez, and Barajas associated with one another before the robbery.  But according to Diez and Chavez, the court abused its discretion in admitting

22

the photograph. In their view, the photograph had marginal probative value but was highly prejudicial because the jury might have construed Diez's pointing gesture as a gang sign. We find no abuse of discretion in the court's admission of this photograph.

Again, evidence may be excluded under section 352 if its probative value is substantially outweighed by the probability that its admission would, among other things, create "substantial danger of undue prejudice." We will not set aside a trial court's decision to admit or exclude evidence under section 352 if "there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken.' " (*Gonzales*, *supra*, 20 Cal.3d at p. 507.)

Reviewing the evidence here, we find the trial court did not abuse its discretion in concluding the photograph had probative value. Diez's counsel appeared to acknowledge as much at trial. As he noted, the prosecution "probably" sought to admit the photograph "to show they have some sort of association before" the robbery. The prosecution then confirmed this intent, noting the photograph was meant to show "the association between the three" defendants. Although Diez and Chavez now attempt to diminish the evidence's probative value, we find none of their arguments persuasive. First, they suggest the photograph had limited probative value in evidencing the defendants' prior association because defense counsel "did not contest this issue" at trial. But in support, they only cite defense counsel's statement to the court that "[w]e *might* even stipulate that there's an association between the parties before the incident." Defense counsel, however, never appears to have in fact offered to stipulate to the defendants' prior association. Second, Diez and Chavez contend it was enough that "all three were captured by the police after the SUV was detained." But as the Attorney General notes, evidence of their prior association was still relevant to the prosecution's theory that the three defendants were close and planned the robbery as a group. (See *People v. Montes* (2014) 58 Cal.4th 809, 858-859 [gang evidence showing codefendants' prior affiliation found relevant to show codefendants' "relationship with each other" at the time of the

23

crime and to show "that defendant and the codefendants were part of the group" that committed the crime].)  Third, Diez and Chavez note that Diez and Barajas shared the same grandmother, which would suffice to show the defendants' close relationship.  But that Diez and Barajas shared the same grandmother does not necessarily show a close personal relationship between the two, and it says nothing of their relationship with Chavez.

We also find the trial court did not abuse its discretion in finding Diez and Chavez fell short of showing the photograph prejudicial.  At trial, Diez's counsel argued that Diez's gesture "could be easily construed by the jury to be some sort of gang hand sign."  The prosecutor and the court accepted that jurors could perhaps "speculate" along those lines, but neither found Diez's counsel's contention reasonable.  The prosecution maintained it only looked like Diez was "pointing his finger."  And the court agreed, stating that "it does appear the only hand sign being shown looks like it's nothing more than an index finger being pointed up.  So it doesn't have what one might typically see that's a gang sign."  Although Diez and Chavez maintain the court abused its discretion in this regard, they offer nothing more than speculation that the jury might have believed Diez's pointing was a gang sign.  That is not enough.  For evidence to be excluded under section 352, the "probability" of a "substantial danger" of prejudice must "substantially" outweigh the probative value.  (§ 352; *People v. Holford* (2012) 203 Cal.App.4th 155, 167.)  Accepting their conclusory argument would threaten to bar the admission of any photograph of a person making a gesture, no matter how common or innocuous the gesture may be.  We decline to do so.  Although we accept some gestures certainly might warrant concern, Diez's and Chavez's mere speculation that a jury might confuse a pointing gesture with a gang sign, without any explanation, cannot support reversal here.  (See *Gonzales*, *supra*, 20 Cal.3d at p. 507 [trial court action reviewed under the abuse of discretion standard will not be set aside if there exists a " 'fairly debatable justification' "].)

24

## V

### *Cumulative Error*

Diez and Chavez also contend we should reverse based on the doctrine of cumulative error—a doctrine applicable when a series of trial errors rises to the level of prejudicial error, even though each individual error, considered alone, is harmless. (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  But because we find no individual error— apart from the slight miscalculation of custody credits, discussed below—we also find no cumulative error.

## VI

### *Sufficiency of the Evidence to Show Chavez Personally Used a Firearm*

Chavez next contends the evidence was insufficient to show he was one of the armed men who robbed Susan B. and Greg S.  According to Chavez, it was "equally likely" that he was only the driver of the car and not one of the two robbers.  We find the evidence sufficient to support the conviction.

To determine if sufficient evidence supports a jury's finding, we must " ' "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.)  Our job is not to evaluate witness credibility, " 'for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]" (*Ibid.*)  Nor is it our job to reweigh the evidence.  We instead must resolve all conflicts in the evidence in favor of the judgment's findings, so long as these findings are based on substantial evidence and not speculation, supposition, or conjecture.  (*Ibid.*; *People v. Davis* (2013) 57 Cal.4th 353, 360.)

25

Viewing the evidence under this deferential standard, we find the evidence sufficient to support the jury's finding.

First, the jury had sufficient evidence to find that Chavez participated in the robbery. Chavez does not contend otherwise—though in his telling, he was present as the driver, not one of the armed robbers. Susan B. and Greg S. reported being robbed around 7:00 p.m. by two men with guns who fled in an SUV, and minutes later, officers located an SUV that matched the description Susan B. provided. After the officers followed, three men fled the SUV on foot. The officers apprehended two of the fleeing men immediately—Diez and Barajas—and after a brief search, they found Chavez hiding in a nearby dumpster. The officers also found, in the SUV and on Barajas, several of Susan B.'s possessions. Shortly after, Susan B. arrived on scene and told an officer that Chavez looked "familiar" from the robbery. Taken together, this evidence was enough for the jury to find that Chavez participated in the robbery.

The jury also had sufficient evidence to find that Chavez was one of the armed robbers and not, as Chavez now suggests, the getaway driver. To begin, a sign on the driver's side door—which included Diez's cell phone number—tended to show that Diez controlled the car and thus Diez, not Chavez, was the driver. Susan B.'s statements to officers at the time supported this conclusion. Susan B. saw the two robbers but only "vaguely" saw the driver. Consistent with Diez being the driver, Susan B. told an officer that Diez was "not familiar." And consistent with Chavez being one of the robbers, Susan B. told an officer that Chavez, in contrast, was "familiar." Although she was "not certain," she believed Chavez looked "familiar" from the robbery—having "the right height, shape, so forth." Considering this evidence together, we find the jury had sufficient evidence to conclude that Chavez was one of the armed robbers. (See *People v. Sullivan* (2007) 151 Cal.App.4th 524, 564 [substantial evidence supported robbery conviction "[d]espite the failure of the victim to positively identify defendant at trial or in a pretrial photo lineup"].)

26

## VII

### *Presentence Custody Credits*

Chavez next contends he is entitled to two additional days of custody credits. The Attorney General acknowledges the miscalculation and notes Diez is entitled to similar relief. We agree.

Defendants are entitled to custody credits for all days spent in custody. (Pen. Code, § 2900.5, subd. (a).) "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)

Chavez was arrested on November 27, 2011 and, according to the probation report, initially released on December 2, 2011—entitling him to six days of custody credit for this period. He then returned to custody on April 23, 2015 and remained in custody until being sentenced on July 31, 2015—entitling him to an additional 100 days of credit, for a total of 106 days custody credit. But Chavez was mistakenly only awarded 104 days of credit, two days short.

Diez, in turn, was arrested on November 27, 2011 and, according to the probation report, initially released on December 13, 2011—entitling him to 17 days of custody credit for this period. He then returned to custody on August 15, 2014 and remained in custody until being sentenced on July 31, 2015—entitling him to an additional 351 days of credit, for a total of 368 days custody credit. But Diez was mistakenly only awarded 366 days of credit, also two days short.

To correct these errors, we will direct the trial court to modify the judgments to provide that both Diez and Chavez are each entitled to two additional days of actual credit.

## VIII

### *Firearm Enhancements*

Finally, in a supplemental brief, Chavez contends we should remand to allow the trial court to exercise its newly granted discretion under Penal Code section 12022.53 to strike firearm enhancements. The Attorney General agrees. So do we.

The California Legislature amended Penal Code section 12022.53, subdivision (h), effective January 1, 2018, to give the trial court discretion to strike, in the interest of justice, a firearm enhancement imposed under that statute. (See Sen. Bill No. 620 (2017-2018 Reg. Sess.), Stats. 2017, ch. 682; *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1079-1080.)

Although this amendment became effective well after Chavez's conviction, we agree, as Chavez contends, that it applies retroactively to Chavez and other defendants whose sentences are not yet final. This conclusion follows from the general rule that "when a statute mitigating punishment becomes effective after the commission of the prohibited act but before final judgment the lesser punishment provided by the new law should be imposed in the absence of an express statement to the contrary by the Legislature." (*People v. Francis* (1969) 71 Cal.2d 66, 75-76.) Applying this principle here, we find that because Penal Code section 12022.53, subdivision (h) is a "statute mitigating punishment"—and because the Legislature has not prohibited its application to defendants whose sentences are not yet final—it applies retroactively to benefit Chavez. (See *People v. Flores* (2020) 9 Cal.5th 371, 431; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1089-1090; *People v. Billingsley*, *supra*, 22 Cal.App.5th at p. 1080.) We thus remand to allow the trial court to exercise its newly granted discretion under Penal Code section 12022.53 to strike firearm enhancements.

## DISPOSITION

We remand to allow the trial court to consider whether to strike or dismiss Chavez's firearm enhancements.  We also direct the trial court to prepare amended abstracts of judgment to correctly reflect Diez's and Chavez's custody credits.  Diez's judgment should list 368 days, rather than 366 days, of actual credit; and Chavez's judgment should list 106 days, rather than 104 days, of actual credit.  After preparing amended abstracts of judgment reflecting these changes, the trial court must forward certified copies to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.

/s/
BLEASE, Acting P. J.

We concur:


/s/
MURRAY, J.


/s/
BUTZ, J.*

---

*  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.